Jack Hamel v. Commissioner. Jack Hamel and Jane Hamel v. Commissioner.
Hamel v. Commissioner
Docket Nos. 77713, 77714.
United States Tax Court
T.C. Memo 1960-121; 1960 Tax Ct. Memo LEXIS 171; 19 T.C.M. (CCH) 635; T.C.M. (RIA) 60121; June 8, 1960
*171 Held, that an accrual basis automobile dealer must accrue as income for each taxable year the amount of the net increase for such year in a dealer's reserve account credited to him on a finance company's books, notwithstanding that such reserve account was composed only of portions of the finance company's charges which were allowed to such dealer. Fred S. Ball, Jr., Esq., First National Bank Building, Montgomery, Ala., for the petitioners. Homer F. Benson, Esq., for the respondent. PIERCE Memorandum Opinion PIERCE, Judge: The Commissioner determined deficiencies in income tax for the years 1956 and 1957 in the respective amounts of $970.67 and $2,327.21. The cases were consolidated for trial. The sole issue for decision is whether the net increases in petitioner's credit balance of an automobile *172 dealer's reserve account, composed only of that portion of a finance company's charges allowed to petitioner as such a dealer, are taxable to the petitioner as accrued income for the years when such increases occurred. All the facts have been stipulated and are so found. Such facts may be summarized as follows. Petitioners Jack and Jane Hamel were, during the taxable year 1956, husband and wife and residents of Montgomery, Alabama. They filed a joint income tax return for said year with the district director of internal revenue at Birmingham, Alabama. Jack Hamel (hereinafter referred to as the "petitioner") filed a separate income tax return for the year 1957 with the same director. Jane Hamel is a party herein solely by reason of having joined with her then husband in filing the joint return. During the taxable years, petitioner operated, as a sole proprietor, an automobile dealership in Montgomery, trading under the name of Southern Motor Imports. The proprietorship books were kept, and his proprietorship income was computed and reported for Federal income tax purposes, on an accrual basis of accounting. Nearly all of his credit sales of automobiles were financed through a *173 local concern, Associates Discount Corporation (hereinafter referred to as the "finance company"). The petitioner's contract with the finance company provided as follows: "SPECIAL WITHOUT RECOURSE PLAN Montgomery, Alabama, May 1, 1955 "TO ASSOCIATES DISCOUNT CORPORATION: "1. You propose to buy from us contracts to you evidencing our time sales of new and used cars. Such contracts will be assigned to you under this agreement without recourse as to the customer's obligation of payment, except as may be otherwise provided by the terms of any specific assignment. Any contracts assigned to you covering commercial cars used for long distance hauling, commercial cars of more than two tons capacity, busses, cars used for taxi, jitney, or "drive-yourself" service, or cars sold to relatives or employees, or employees of affiliated or subsidiary companies shall be assigned to you with our full recourse endorsement and, in the absence thereof, you may make the necessary correction in our assignment. "2. With respect to contracts assigned to you without recourse as to the customer's obligation of payment, the following provisions shall apply: "a. All repossessed cars delivered to *174 us at our place of business within 90 days after maturity of the earliest installment still wholly in default will be stored by us at our risk and expense, but as your property, and we shall sell them for you. On each such sale by us we shall promptly remit the proceeds to you, less the cost of placing the car in salable condition (which shall in no case exceed $100.00 without your prior written consent) and less salesman's commission. The selling price of the car shall not be less than the amount established by you. Net loss shall be the difference between the proceeds remitted by us to you and the unpaid balance on the car, and net losses shall be charged against our hold reserve. "b. We shall have no responsibility as to converted or confiscated cars until they are repossessed or recovered and tendered as above. "c. If actual direct collision damage necessitates repossession, the unpaid balance, for the purpose of establishing net loss, shall be reduced by the lowest of the following: "(1) The cost of repairs; or "(2) Unpaid balance less value before repairs; or "(3) The amount, if any, by which the retail value after repairs falls short of the unpaid balance plus cost *175 of repairs. "d. Should we at any time desire that you undertake the sale of any repossessions, or should you at any time desire to do so, we shall deliver to you those in our possession. "e. On each sale by you, net loss or gain shall be the difference between the amount you realize as gross proceeds and the unpaid balance on the car plus the cost of putting the car in salable condition. Net gains shall be added to our hold reserve, except where otherwise required by law. Net losses shall be charged against our hold reserve. "f. Should we fail to sell any repossessed car within a 30 day period after delivery to us, we will deliver the car to you or pay you the fair value of the car as mutually agreed between us, and the difference between the amount remitted by us to you and the unpaid balance shall be treated as net loss, as outlined above. "3. As of Monthly, you will pay us our regular reserves in full. Our liability on repossessed cars shall not exceed the amount of our hold reserves except as we may be otherwise liable hereunder or by the terms of the assignment of any contract purchased from us. As of Annually, if we are not then indebted to you, you will pay us our accumulated *176 hold reserves in excess of 5% of the then aggregate unpaid balances on contracts purchased from us, provided, however, that such payment shall not reduce the accumulated hold reserves below $1,500. Any holdback shall be payable to us when the related contract is fully paid, except as may be otherwise agreed. "4. Notwithstanding the language of the related assignment, if we make any settlement with the customer without your written consent, or if we breach any provision of the assignment to you, we agree to pay you on demand the then existing balance on such contract. "5. This agreement shall apply to all contracts hereafter sold to you irrespective of transfers between or extensions of time to customers until the contracts are liquidated. No waiver or change of any part of this agreement shall be binding on you unless evidenced by a writing signed by one of your officers. This agreement shall inure to and bind our respective successors and assigns and any company affiliated with you which may transact business hereunder. "6. Purchase of contracts by you shall constitute your acceptance of this agreement. Southern Motor Imports By: Its Owner " When petitioner sold a car *177 on credit, he would take the purchaser's note in a total amount composed of (a) the unpaid balance of the purchase price of the car, and (b) certain fees, charges and insurance premiums, as described hereinbelow. The note was secured by a conditional sales contract between petitioner and the purchaser, under which title to the automobile covered thereby was reserved in petitioner until the entire amount of the note was paid. Petitioner would thereupon sell and assign the note and the conditional sales contract (such instruments being hereinafter called "the installment paper") to the finance company. The stipulation of facts contains an example of a sale of installment paper by the petitioner to the finance company, as follows: "if the automobile sale price was $3000.00 and his [petitioner's] customer paid $300.00 in cash or by credit for a trade-in, the balance of the sale price would be $2700.00. To this amount would then be added recording fee, the finance company's charge and insurance premium. If these amounted to $200.00, the total amount of the note and contract would be $2900.00. When Hamel would assign this note and contract to the finance company he would receive only *178 the $2700.00 balance of the automobile sale price." The finance company, upon receipt and acceptance of the installment paper in a transaction, would enter a credit in an account on its books, called "Reserve Account of Southern Motor Imports." The amount so credited was a portion of the finance company's charges. [1] As above indicated, the finance company would then issue its check in payment for each note and conditional sales contract sold and assigned to it by petitioner; and such check was drawn in an amount equal to the unpaid purchase price of the car. A detachable voucher was attached to such check, showing the amount of the credit entered in the said reserve account. Petitioner made notations of totals of credits appearing in the above-described vouchers, in a memorandum account on his books, entitled "Reserve Receivables Associates Discount Company"; and offsetting entries were made in another memorandum account called "Reserve for Repossessions." Periodic statements were furnished to the petitioner by the finance company showing the credits and debits [2] entered *179 in the "Reserve Account of Southern Motor Imports" on the books of the finance company. The amounts of the increases in the net credit balance in such reserve account were $2,257.39 and $3,764.61, for the years 1956 and 1957, respectively. In neither of said taxable years here involved did petitioner receive any cash payment on account of the credit to the above-mentioned reserve account on the finance company's books and in neither taxable year did the balance therein ever exceed 5 per cent of the balance of the notes assigned by petitioner to the finance company. Petitioner did not include in taxable income on his return for either of the taxable years involved, any portion of the abovementioned increases in the net credit balance of the reserve account on the finance company's books. The respondent, in his notice of deficiency, determined that the amount of such increase for each year was includible in petitioner's income for such year. Such adjustments by the respondent *180 gave rise to the sole issue here presented for decision. In the recent case of , the Supreme Court dealt with the general problem of the taxability of automobile dealers' reserves. In that case the taxpayer was an accrual basis automobile dealer who sold most of his cars on credit, taking from the purchaser a note secured by a conditional sales contract or some other form of security. The dealer then sold and assigned the installment paper of each sale to finance companies with whom such dealer had contracts. The dealer guaranteed payment of the notes by the purchasers. The Supreme Court held that the amounts withheld by the finance companies from the sums due by them to the dealer (which amounts were credited by the finance companies to dealers' reserve accounts for the purpose of securing the dealer's guarantee of payment by the car purchasers) were accruable as income by, and were taxable to, the dealer in the year when the amounts were credited to the reserve accounts. The Court pointed out that the dealer would ultimately receive the amounts so credited, either by payment in cash or through the medium of having the same applied *181 in satisfaction of the dealer's guaranty obligations. As the Court further pointed out, the taxpayer in the Hansen case argued that the amounts withheld by the finance companies and credited to the dealer's reserve accounts, included "percentages of 'finance charges' which the finance companies agreed to allow * * *, and that such percentages of the 'finance charges,' not being a part of the purchase price of the installment paper, should in no event be regarded as accrued income to the dealers." The Court answered this argument by saying that the taxpayer had failed to sustain his burden of showing that the "percentages of 'finance charges'" were entitled to any special or different treatment from the other elements of the dealer's reserve accounts. Petitioner, in the instant case, argues that he has proved what the taxpayer failed to prove in the Hansen case. We agree that he has shown with clarity the composition of the reserve account, and the nature of his rights and obligation with respect to that account. Unfortunately however, from petitioner's point of view, the matter which he has proved brings his case squarely within the basic rationale of the Supreme Court's decision *182 in the Hansen case. Petitioner will ultimately receive the increase in the net credit balances in the reserve account here sought to be taxed to him, either in cash or through satisfaction of his obligation to make good any losses sustained on sales of repossessed cars. There is no magic in the words "without recourse," which appear in the contract between petitioner and the finance company. To be sure, petitioner did not undertake to guarantee payment by the purchasers, and to that extent his sale and assignment of the installment paper to the finance company may be said to have been "without recourse." But, petitioner had another, and no less definite, contingent liability: To make good any loss sustained in respect to the sale of repossessed cars. And it is clear to us from the provisions of the contract, that the dealer's reserve account here involved was the means for satisfying such obligation. The mere fact that, as argued by petitioner, the finance charges might have been subject to reduction if the automobile purchasers prepaid their notes (with a consequent decrease in the credit to petitioner), is not sufficient to justify a conclusion that the credits to the reserve *183 account were not accruable by petitioner. , affirmed per curiam, (C.A. 6); and , affirming per curiam , certiorari denied . In the recent case of , this Court decided against the taxpayer an issue which was substantially the same as that presented in the instant case. We here follow that decision. Finally, we note an implied congressional approval of treating dealers' reserve accounts which are composed of portions of finance charges, in the same manner as dealers' reserve accounts which are composed of portions of the purchase price of sales contracts, notes, and other evidences of indebtedness. In the recently enacted Public Law 86-459, Stat. , (approved May 13, 1960), Congress provided a measure of relief for automobile dealers who are compelled to include in their income, amounts credited to dealers' reserve accounts. In section 5 of this statute, Congress defined "dealer reserve income" as follows: "SEC. 5 DEFINITIONS; SPECIAL RULES. "(a) Dealer *184 reserve income. - For purposes of this Act, the term 'dealer reserve income' means that part of the consideration derived by any person from the sale or other disposition of customers' sales contracts, notes, and other evidences of indebtedness (or derived from customers' finance charges connected with such sales or other dispositions) which is -" * * *
Based on all the foregoing, we approve the determinations of the respondent herein. Decisions will be entered for the respondent. Footnotes
1. The method of computing the amount to be credited to the reserve account is not shown by the record.↩
2. Debits to such reserve account presumably were caused by losses sustained on sales of repossessed cars which, under the contract between petitioner and the finance company, he was bound to make good.↩